**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| JODY I. DELONJAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-3002 |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Jody I. Delonjay appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act. 42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g). Delonjay filed a Motion for Summary Judgment (d/e 11). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 14). The parties consented to proceed before this Court. Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered January 19, 2018 (d/e 17). For the reasons set forth below, the decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

Delonjay was born on June 12, 1962.  She completed high school.

Delonjay filed her application for Disability Benefits on October 12, 2012.

She has not engaged in substantial gainful activity since August 11, 2012.

Delonjay previously conducted door-to-door interviews for government

surveys.  She testified that she last worked on August 12, 2012.  She

suffers from history of concussion and right comminuted humerus fracture,

degenerative disc disease of the cervical spine with history of fusion,

depression, anxiety, and borderline personality disorder.  She also suffers

from headaches, a history of right shoulder replacement, and past

substance abuse.  Certified Transcript of Proceedings before the Social

Security Administration (d/e 7) (R.), 35-38, 54, 64, 65, 303, 310.

On July 30, 2012, Delonjay saw her primary care physician Dr.

Herbert E. Childress, D.O., for treatment and management of right shoulder

pain and cervical pain.  She was status post comminuted fracture of her

right humerus and status post cervical fusion with internal hardware fixation

devices.  R. 297.  On examination, Dr. Childress noted reduced range of

motion of the cervical spine and reduced range of motion in the right

shoulder secondary to internal hardware fixation device and previous

fracture.  Delonjay reported that she had no history of drug misuse, and

she exercised five or more times per week. Dr. Childress assessed chronic intractable pain from cervical radiculitis, discogenic disease, and status post fracture right humerus. R. 297-98. Dr. Childress' records of this visit did not mention memory loss.

On August 1, 2012, Delonjay went to the emergency room with right foot pain. She was assessed with bunions. R. 281, 398, 423-24. Delonjay did not report any problems with memory loss.

On October 4, 2012, Delonjay saw Dr. Childress to discuss getting on disability. R. 293-95. Dr. Childress noted Delonjay's subjective history as follows:

History of Present Illness

> SUBJECTIVE: Patient reports here today with ongoing treatment and management of her cervical radiculitis, her migrainous cephalgia and her other multitude of medical problems which includes a comminuted fracture right humerus with arthroplasty for a total joint replacement. She cannot focus, cannot concentrate based on her chronic pain management and this makes her dire need of a consideration for a different occupation and/or no occupation as she has been through a multitude of surgical surgeries, right humeral surgeries, chronic intractable pain and medication management for same.

R. 293. On examination, Dr. Childress found reduced range of motion of the right shoulder, surgical scarification from shoulder surgery and cervical spine surgery. Dr. Childress noted, "We referred her to decompression and fusion and she has had some relief but adhesive radiculopathy has

encompassed her with reoccurring chronic pain." R. 293. Dr. Childress assessed cervical radiculitis secondary to degenerative discogenic disease as well as adhesive radiculopathy, and recurring right shoulder pain secondary to arthroplasty and comminuted fracture right humerus. Dr. Childress opined, "She needs to not be participating in physical activity associated with occupation. I would consider her 100% incapacitated." R. 293. Dr. Childress also noted "no reported history of drug misuse," and "Exercises 5 or more days/wk." R. 294.

Dr. Childress prescribed hydrocodone-acetaminophen (Norco), baclofen, butalbital-acetaminophen-caffeine (Fioricet), lorazepam (Ativan), and promethazine. R. 294-95. Dr. Childress did not order any tests, such as x-rays, MRIs, or EMG/nerve conduction studies, and did not recommend physical therapy or other treatment to address Delonjay's condition.

On or about October 31, 2012, Delonjay completed a Social Security Administration Disability Report—Adult form. R. 201-11.[1] Delonjay reported that she suffered from degenerative disk disease, status post cervical surgery, right shoulder replacement, eosinophilia, migraines, recurrent kidney stones, chronic pain, depression, anxiety, and PTSD. R. 202.

---

[1] For date of the report, see R. 228 (listing 10/31/2012 as date of Disability Report).

On December 30, 2012, Delonjay's husband Jeffrey S. Delonjay completed a Function Report—Adult—Third Party form. R. 212-19. Jeffrey Delonjay reported that Delonjay could not keep a daily routine due to pain. He stated that she did not feel good more than two to three days in a row. He said that she did not take care of anyone else. He said that she had no normal sleep routine, sometimes too much sleep, sometimes not enough. He said Delonjay could dress and bathe herself, but she had trouble bending and he had to remind her sometimes to take a bath. He helped shave her underarms. She could feed herself. R. 213. Jeffrey Delonjay said that Delonjay needed reminders to take medicine. R. 214.

Jeffrey Delonjay said that Delonjay prepared meals daily. She made sandwiches, soup, and frozen pizza; and prepared full meals two to three times a week. Jeffrey Delonjay said Delonjay did household cleaning and laundry two to three times a week. She had no consistent cleaning routine. He said she had good days and bad days. R. 214.

He said she got out of the house shopping three times a week. She both drove and rode in cars. Shopping usually took 30 minutes. R. 215. He said she was with her grandchildren two to three days a week. R. 216. Jeffrey Delonjay said Delonjay had a short temper. R. 217.

Jeffrey Delonjay opined that Delonjay could lift 10 pounds, stand 10 to 15 minutes, and walk two blocks. He said she needed a 10-minute rest after walking two blocks. He said she could pay attention for five to 10 minutes. He said she did not finish what she started. He said her ability to follow written and spoken instructions depended on how she felt at the time. R. 217. He said she could get along with authority figures. She could not handle stress or changes in her routine well. R. 217.

On January 2, 2013, Delonjay saw Dr. Childress. R. 286-88. Dr. Childress noted that Delonjay reported that she exercised five or more days a week and had no history of drug misuses. R. 288.

On February 27, 2013, psychologist Dr. Frank Froman, Ed.D., conducted a consultative mental examination of Delonjay. R. 303-07. Delonjay's appearance and presentation was unremarkable. She had a good ability to relate, her speech was normal, and she made good eye contact. R. 304.

Delonjay reported that she had a history of drug abuse, including cocaine, alcohol, and methamphetamine. She reported that in August 2012 she was in inpatient drug rehabilitation treatment for 49 days. She said she went into treatment to see if she could live without Norco. R. 303-04.

Delonjay reported to Dr. Froman that she had a driver's license, smoked one pack of cigarettes a day, and socialized modestly. She reported that she cleaned house and took care of her grandchildren. She said that she loved her grandchildren. She said that her grandchildren made her happy. She said she could perform her own self-care, but some days she hurt too much to do such care. She said she could do chores, but sometimes, "'particularly if my kidneys act up, it hurts too much to do them.'" R. 304.

Delonjay reported to Dr. Froman that she was frequently depressed and anxious. She reported that she suffered from PTSD due to her mother's abusive treatment of her as a child. She reported, "'I have fugue episodes.'" Dr. Froman stated:

> Unfortunately, there is no psychological documentation of this. What we have in her record is a medical note about shoulder and cervical root compression injuries. One would need to look back on her psychiatric background in order to document these problems that she alleges.

R. 305. Dr. Froman diagnosed nicotine dependence, continued marijuana use, history of alcohol and cocaine abuse in full remission, mood disorder not otherwise specific, allegations of fugue states, and borderline

personality disorder.  Dr. Froman assigned a Global Assessment of Functioning (GAF) score of 55.  R. 305.[2]

Dr. Froman opined that Delonjay could perform one or two-step assemblies at a competitive rate, she could relate to others, and she could understand oral and written instructions.  Dr. Froman expressed concern about the allegations of Fugue states, but offered no opinion on the allegations because no historical documentation existed in the records provided.  R. 305.

On March 11, 2013, Delonjay saw Dr. Childress for medication refills and back pain after a recent fall.  R. 328-30.  Delonjay reported that she had headaches that were controlled with Fioricet.  Dr. Childress asked about the frequency of her use of Fioricet and rebound headaches. Delonjay said she "takes it under advisement."  Delonjay also reported that she was under Dr. Froman's care for depressed mood.  R. 328.

On examination, Dr. Childress found that Delonjay had "intermittent tension cephalgia secondary to stressors of life."  Dr. Childress noted reduced range of motion in lumbar spine.  He stated that "previous radiographs confirm her degenerative discogenic disease."  R. 328.  Dr.

---

[2] A GAF score of 55 indicates moderate symptoms or functional difficulties.  Diagnostic and Statistical Manual of Mental Disorders (4th ed., Text Revision) (DSM-IV-TR), at 34.  The American Psychiatric Association no longer recommends using GAF scores.  Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.

Childress noted that Delonjay had surgery on her right arm for right humerus fracture on January 29, 2007. Dr. Childress renewed her medications. R. 328.

The next day, on March 12, 2013, state agency physician Dr. Joseph Kozma, M.D., performed a consultative examination of Delonjay. R. 310-15. Delonjay reported to Dr. Kozma that she had right shoulder replacement surgery and had decreased range of motion in her right shoulder. She reported that her memory was poor. She reported that she had "difficulty with spatial orientation although she does not get lost." She reported having migraine headaches. She reported that the headaches "are not very frequent and she takes some Fioricet for that." She reported "some type of post traumatic syndrome" caused by her mother when she was younger. She reported that she had chronic anxiety. She reported that she had panic attacks three times a month. She said she had shortness of breath during the panic attacks. R. 310.

Delonjay reported that she had kidney stones removed in 2009, right shoulder replacement surgery in 2008, and surgery on her neck in 2007. Delonjay reported that she was bipolar. R. 311. She said she had migraine headaches once or twice a month. R. 311.

On examination, Dr. Kozma found that Delonjay had normal range of motion in her cervical spine. She had no tenderness in her cervical spine and her neck muscles had normal tone without rigidity. R. 312. Her upper extremities had normal strength. Her left shoulder had normal range of motion. Her right shoulder had limited range of motion in forward elevation, backward elevation, and abduction. Delonjay had normal internal and external rotation, and adduction of the right shoulder. She had normal dexterity and normal grip strength. R. 313. Delonjay's lower back showed no tenderness and normal tone.

Dr. Kozma's neurological examination showed deep tendon reflexes of 3+ in the lower extremities and 4+ in the upper extremities; normal sensory examination; normal cranial nerve examination; no abnormal reflexes; and normal equilibrium. R. 313.

Dr. Kozma's functional examination showed that Delonjay had normal heel and toe walking, and squatting. She had a normal gait and no postural instability. She could bend forward with her leg straight and reach within an inch of the floor. Her lumbar spine flexion was 95 degrees; rotation of her upper pelvis was 45 degrees in both directions, lateral tilt was 25 degrees in both directions, and extension was 10 degrees. Her

straight leg raising was 85 degrees for the right leg and 90 degrees for the left.  R. 314.

Dr. Kozma observed that Delonjay was oriented in all spheres and seemed to have a stable emotional state.  Delonjay's intellectual functions were intact, and her thought content and communication were proper to the occasion.  R. 313.

Dr. Kozma concluded:

DISCUSSION: Ms. Delonjay is a right handed individual who has no difficulty using her hands and fingers for gross and fine manipulations. Her grip strength is good, so is her finger dexterity.

She is complaining of generalized aches and pains but she emphasizes that her main problem, really, is emotional. She has bipolar disorder. She also has significant changes in her memory.

She is depressed. This is a lifelong condition for her and she is not suicidal.

She has some days when she cannot remember things and she has nightmares and she attributes that to mistreatment that she experienced when she was very young and her mother was the person causing the problems.

She has a history of kidney stones in the past but she has no problem now.

She has a great deal of anxieties. She has panic attacks. She had three (3) to four (4) of them during the past months. It used to be much more frequent.

Her right shoulder replacement is working satisfactory. The range of motion is determined by the hardware.

She has a condition that she was told but she does not know what it is and she simply says it is called eosinophilia but no further information is found.

A review of some of the medical records indicate that she has chronic cervical radiculitis and her pain in the right shoulder is considered to be intractable. She is taking narcotic pain medications.

It seems that her medications are quite adequate. Reduction of the range of motion of the right shoulder is noted in one of the medical records.

This examination and interview required 38 minutes to complete and is considered reliable.  If you need additional information or desire clarification, please contact me at your convenience.

**IMPRESSION:  Chronic pain in the right shoulder.**

**History of arthroplasty of the right shoulder.**
**Decreased range of motion of the right shoulder.**
**Pain in the cervical spine.**
**Defective memory (needs assistance).**
**Bipolar disorder.**
**Possible chronic pain syndrome.**
**History of migraine headaches.**

R. 314-15 (emphasis in the original).

On April 24, 2013, Dr. Richard Lee Smith, M.D., prepared a Physical

Residual Functional Capacity Assessment of Delonjay.  R. 95-97.  Dr.

Smith opined that Delonjay could occasionally lift 50 pounds, frequently lift

25 pounds, stand and/or walk six hours in an eight-hour workday, and sit

six hours in an eight-hour workday.  He opined that Delonjay was limited in reaching overhead with her right hand.  Dr. Smith said that the shoulder replacement decreased her range of motion, "particularly abduction of only 90º."  R. 96.

On May 14, 2013, psychologist Dr. Joseph Mehr, Ph.D., completed a Psychiatric Review Technique.  R. 93-95. Dr. Mehr opined that Delonjay had an affective disorder, personality disorder, and substance addiction disorder.   He opined that Delonjay's mental disorders caused mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace.  Dr. Mehr opined that Delonjay had no episodes of decompensation of extended duration.  R. 94.  Dr. Mehr noted as one of his additional explanations, "FOFAE NON-SEVERE."  R. 94.  Dr. Mehr recited Dr. Froman's findings.  R. 94.  The acronym "FOFAE" means Findings of Fact and Analysis of Evidence.  See e.g., Nerland v. Berryhill, 2017 WL 345461, at *3 (D. Kan. August 8, 2017).

On or about May 24, 2013, Delonjay completed a Social Security Administration Disability Report—Adult form. R. 228-33.  See Disability Report—Field Office form, R. 234-35.  Delonjay reported that she was having more memory problems, more nerve pain in her arms, legs,

buttocks, and feet.  She reported that the changes in her condition began on May 1, 2013.  Delonjay said she had no new limitations as a result of her impairments.  R. 288.

On June 20, 2013, Delonjay saw Dr. Sharon Harris M.D.  Delonjay reported diffuse constant myalgias.  She reported problems with short-term memory.  On examination, Dr. Harris found no proximal muscle weakness.  Dr. Harris was unable to determine a unifying diagnosis for her symptoms.  She posited that Delonjay's status post menopause may be a reason for some of her symptoms.  Dr. Harris recommended stopping smoking, exercising, and eating a healthy diet.  R. 326.  Delonjay reported to Dr. Harris that she had no history of drug use and that she exercised five or more days per week.  R. 325.

On August 20, 2013, Delonjay saw Dr. Childress.  Delonjay reported memory loss spanning a few days.   R. 376-77.  On August 22, 2013, Delonjay underwent an MRI of her brain because of indications of amnesia and headaches.  The MRI was normal with no significant findings.  R. 356, 382.

On September 6, 2013, psychologist Dr. Linda Lanier, Ph.D., prepared a Psychiatric Review Technique for Delonjay.  R. 105-07.  Dr. Lanier repeated verbatim with Dr. Mehr's opinions in all material respects.

On September 9, 2013, Dr. Vidya Madala, M.D., prepared a Physical Residual Capacity Assessment. R. 107-09. Dr. Madala repeated verbatim Dr. Smith's opinions in all material respects.

In September 2013, Delonjay completed a Social Security Disability Report Appeal form. R. 236-42.[3] Delonjay reported that her memory episodes were worse, her constant nerve pain was worse, and her cervical pain was worse. She stated that the changes in her condition occurred on September 15, 2013. R. 236.

On September 30, 2013, Delonjay saw Dr. Julie Viehmann, D.O., for an annual gynecologic examination and pap smear. On examination, Dr. Viehmann noted no costovertebral angle tenderness and a normal musculoskeletal examination. R. 339.

On October 11, 2013, Delonjay saw Dr. Childress. Dr. Childress noted "point tenderness at cervical regions, C5, C6, C7 radiant to the right arm with radicular pain." Dr. Childress said, "Cephalgia is circumstantial beginning at the base of the occiput and circumferentially surrounding her head." R. 369. Dr. Childress added Soma to her medications and reduced

---

[3] The form is undated; however, the form states her condition changed in the past on September 15, 2013 (R. 236), and she had an appointment scheduled in the future on September 27, 2013 (R. 237). Based on this information, the Court concludes that Delonjay completed the form between those two dates.

the dosage of Norco and Fioricet. Dr. Childress stated that he was concerned about rebound headaches. R. 369.

On October 29, 2013, Delonjay's sister, Alice Hall, completed a form statement about Delonjay. R. 246-48. Hall stated that Delonjay usually felt bad, but her symptoms were unpredictable day-to-day. Hall stated that Delonjay complained about pain in her extremities, primarily in her legs, almost every time she saw Delonjay. R. 246. Hall said she never observed Delonjay use a cane or other device to walk. Hall opined that Delonjay could only walk across a room before she had to sit down for a few minutes. She said Delonjay was usually lying down when Hall saw her. Hall opined that Delonjay could not lift anything heavy. Hall said Delonjay could bathe herself, but had a hard time showering when she was in pain. She said Delonjay could wash dishes when she could stand long enough. Hall said Delonjay was stressed because she could not do things she used to do. R. 247. Hall reported that Delonjay had problems with her memory. Hall said Delonjay had periods when she could not remember things she said or did. R. 248.

On the same day, October 29, 2013, another sister of Delonjay, Ivy Benedict, completed a form statement about Delonjay. R. 250-52. Benedict said that Delonjay had memory problems, daily headaches,

fevers, and daily leg pain.  Benedict said that Delonjay could not sit or lie down for "periods lasting any amount of time."  Benedict said she spent much of her time lying down, but could not get comfortable while doing so. Benedict described her pain as severe.  R. 250.  Benedict said that Delonjay did not use a cane or other assistive device to walk.  Benedict opined that Delonjay could only walk very short distances before sitting or lying down.  Benedict opined that Delonjay could sit for an hour before standing or lying down.  Benedict said Delonjay could not lift much weight. Benedict said Delonjay could take care of herself, but took a long time and rested while caring for herself.  Benedict said she did household cleaning slowly.  R. 251.

Benedict said Delonjay seemed stressed on a daily basis.  Benedict said Delonjay was stressed because of her memory losses, pain, and fevers.  Benedict said Delonjay was upset whenever she visited Delonjay because Delonjay forgot things and because she was physically unable to carry out plans.  R. 252.

On November 8, 2013, Delonjay saw ophthalmologist Dr. Abram Geisendorfer, M.D.  She reported to Dr. Geisendorfer that she exercised five or more days per week and she had no history of drug misuse.  Dr.

Geisendorfer performed a procedure on her eyes to correct anatomically narrow angles.  R. 368.

On December 18, 2013, Delonjay saw Dr. Gary Carpenter, M.D., for headaches, sinus pressure, and an allergy evaluation.  R. 362-66. Delonjay reported that she had headaches since a motor vehicle accident in 1987.  She reported that the headaches were becoming more severe and frequent.  She reported that the headaches were occurring daily.  She reported that she had seen multiple neurologists and underwent multiple scans.  Dr. Carpenter noted that the August 22, 2013 MRI was normal. Dr. Carpenter stated that Delonjay fractured her right shoulder falling down some stairs in 2008.  He stated that she had cervical neck surgery on C4, C5, and C6 in January 2006.  R. 362-63.   Dr. Carpenter said, "She is disabled due to chronic pain and memory problems.  She lost her job in August 2012 because of pain and memory problems."  R. 363. Dr. Carpenter gave Delonjay a sample of Spiriva and ordered a sleep study. R. 365.  On December 23, 2013, Delonjay saw Dr. Human Farah, M.D., who conducted a sleep study.  R. 348-49.  Dr. Farah found no significant sleep disorder.  R. 349.

On January 13, 2014, Delonjay saw Dr. Carpenter.  Dr. Carpenter said that Delonjay experienced post-concussion headaches.  Dr. Carpenter

noted that the sleep study he ordered was normal. Dr. Carpenter stated that Delonjay had a history of headaches after a motor vehicle accident in 1987. She reported she had seen multiple neurologists and underwent multiple scans. Dr. Carpenter noted that the August 22, 2013 MRI was normal. Dr. Carpenter stated that Delonjay fractured her right shoulder falling down some stairs in 2008. He stated that she had cervical neck surgery on C4, C5, and C6 in January 2006. R. 357-58. Dr. Carpenter said, "She is disabled due to chronic pain and memory problems. She lost her job in August 2012 because of pain and memory problems." R. 358. Dr. Carpenter stopped her prescription for Spiriva, but renewed her other medications. R. 360.

On February 10, 2014, Delonjay saw Dr. Childress. R. 389-91. Dr. Childress noted Delonjay's subjective history as follows:

> History of Present Illness
> SUBJECTIVE: Patient reports here today status post cervical decompression and fusion. She has a multitude of medical problems that extends back a considerable period of time. I have taken care of her for a decade or better and this has been ongoing difficulty for her. She has attempted to resume her previous work related activity but based on the chronicity of her medical problems she has been overwhelmed with these and we shall delineate them as same.

R. 389.

On examination, Dr. Childress noted crepitance to flexion, extension, and rotation of the cervical spine; reduced range of motion in the right shoulder; and reduced grip strength bilaterally with right worse than left "based on radiculopathy from her cervical discogenic disease and fusion with what I believe to be adhesive induced radiculitis." R. 389. Dr. Childress noted limited range of motion in the lumbar spine:

> There is reduced range of motion of the lumbar spine to forward bending, backward bending, side bending and this raises question whether the cervical discogenic disease has given her lumbar radiculopathy and reduced functioning or indeed does she have lumbar disease that is compatible with cervical disease.

R. 389. Dr. Childress found radiculopathy in her extremities:

> Neurological finds her to be with radiculopathy to the lower extremities bilaterally. There is radiculopathy to the right and left upper extremities, right worse than left, but there has been previous fractured humerus of the right shoulder and proximal humeral head.

R. 389. Dr. Childress also found headaches and memory deprivation:

> There is memory deprivation secondary to falling down a flight of stairs approximately 13-14 stairs where she was rendered unconscious and received a severe concussion as well as the fractured right humerus at the same time. There are chronic recurring daily headaches that I believe are migrainous in nature from her previous closed head trauma. Neurological finds her to be with memory disturbance, radiculopathy, chronic recurrent daily headaches and certain memory disturbance associated with previous head trauma.

R. 389. Dr. Childress assessed:

ASSESSMENT:
1. Cervical degenerative disk disease.
2. Cervical radiculopathy.
3. Fractured right humerus.
4. Concussion from previous blunt head trauma.
5. Post concussion syndrome from memory deprivation.
6. Chronic daily recurring headaches from previous head trauma.

R. 389.

Dr. Childress stated his plan for her condition:

PLAN: Continue her medical management as is. There is no way she can return to work. She has a multitude of problems. She cannot remember. Her pain medication is impairing in itself. It is my belief that she is 100% physically and mentally incapacitated to carry out the complicated work that she previously does. I consider her 100% incapacitated.

R. 389-90.  Dr. Childress renewed her prescriptions.  R. 390-91.

On November 11, 2014, Delonjay saw Dr. Childress for flank pain, muscle pain, and headache.  Delonjay reported that she had been throwing up for five days the prior week.  Delonjay reported that her daily headaches were worsening and she felt muscle pain all over.  Dr. Childress noted right upper quadrant pain, epigastric discomfort, and nausea.  Dr. Childress refilled her prescription for hydrocodone and gave her a sample of Nexium. R. 430.

On November 28, 2014, Delonjay saw Dr. Childress for a recheck. Delonjay said the "purple pill" helped somewhat but she wanted something

else.  Delonjay also had "disability paperwork that she needs to be filled out."  Dr. Childress prescribed Dexilant instead of Nexium.  R. 431-32.

On December 29, 2014, Delonjay saw Dr. David Arndt, D.O., for upper right quadrant pain.  Delonjay denied any backache or shoulder ache.  On examination, Delonjay's CVA was nontender.  Dr. Arndt ordered an ultrasound of her gallbladder.  After review of the results, Dr. Arndt recommended a surgical consult.  R. 434.

On January 5, 2015, Delonjay saw Medical Assistant Sherrie Hayes to review results of the ultrasound of her gallbladder.  R. 435-36.  On examination Hayes noted that Delonjay had normal range of motion.  R. 436.

On January 28, 2015, Delonjay saw physician's assistant Jaclyn Thobaben, PA-C.  Delonjay reported epigastric abdominal pain with acute attacks after eating.  Her medical history noted new daily persistent headache since December 18, 2013.  A review of symptoms stated that Delonjay was negative for headaches.  On examination, Delonjay's gait was normal, and her mood, memory, and affect were all normal. R. 414-17.

On January 29, 2015, Delonjay was admitted to Blessing Hospital in Quincy, Illinois, for cholecystitis.  She saw Dr. Timothy Scott Smith, D.O.  Delonjay reported upper right quadrant pain.  In a review of her systems,

she said she had occasional headaches.  On examination, Delonjay had good grip strength and sensation was intact. R. 401.  Delonjay discussed options with Dr. Smith and decided to undergo a surgical cholecystectomy to remove her gallbladder.  R. 402.

On February 20, 2015, Delonjay saw Dr. Childress for diarrhea and vomiting.  Delonjay also reported that her legs and hips hurt all the time.  Dr. Childress assessed cervical radiculitis and irritable bowel syndrome.  R. 451.

On March 20, 2015, Delonjay saw Dr. Childress for medication refill.  On examination, Delonjay had normal range of motion and normal reflexes.  Dr. Childress assessed chronic retractable (sic) neck pain.  He refilled her prescription.  She also wanted him to complete some AFLAC paperwork.  R. 453.

On April 14, 2015, Delonjay saw Dr. Ernest Wallace, M.D., for symptoms of a urinary tract infection, vomiting, and diarrhea.  On examination, she had no costovertebral angle pain and "[a] little bit of low back pain."  Dr. Wallace assessed a urinary tract infection and resolved viral gastroenteritis.  R. 454.

On August 4, 2015, Dr. Childress completed a form entitled Medical Source Statement of Ability to do Work-Related Activities (Physical).  R.

481-84.  Dr. Childress opined that Delonjay could occasionally lift 20 pounds and frequently lift 10 pounds, stand and walk three hours in an eight-hour workday, and sit about two hours in an eight-hour workday.  He opined that Delonjay needed to change sitting positions every 15 minutes and change standing positions every 15 minutes; and needed to walk around for 10 minutes about six times during an eight-hour workday.  Dr. Childress opined that Delonjay needed to shift positions at will and needed to lie down every two hours during an eight-hour workday.   Dr. Childress stated that these limitations were due to medical findings of "Frequency of pain Rx use for ADL activity."  R. 481.  The acronym "ADL" means activities of daily living.

Dr. Childress opined that Delonjay could occasionally twist, stoop, bend, crouch, and climb stairs, but could never climb ladders.  R. 482.  Dr. Childress stated that these limitations were due to medical findings of "® arm and shoulder discomfort from Fx. Vertigo post head injury."  R. 482.  Dr. Childress opined that Delonjay could occasionally reach and push/pull; and frequently handle, finger, and feel with her hands and fingers.  Dr. Childress stated that these limitations were due to medical findings of "Previous Fx and head injury."  R. 482.

Dr. Childress opined that Delonjay should avoid concentrated exposure to perfumes; moderate exposure to extreme cold, extreme heat, high humidity, soldering fluxes, and solvents/cleaners; and all exposure to fumes, odors, dusts, gases, and chemicals.  R. 483.  Dr. Childress stated that the medical findings that supported these limitations were, "Rx use and headache frequency as well as previous Fx ® arm."  R. 483. Dr. Childress opined that Delonjay would miss 4 days of work per month due to her impairments or for treatment.  R. 483.  Dr. Childress opined that Delonjay would need to be off-task 25% or more of the time and she would need unscheduled breaks during the workday.  He opined that she would need unscheduled breaks due to muscle weakness; pain/paresthesias; numbness; adverse effects of medication; and cephalgia.  R. 484.

<u>THE EVIDENTIARY HEARING</u>

On August 5, 2015, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 60-88.  Delonjay appeared with her counsel. Vocational expert Dr. Roxane Minkus, Ph.D., also appeared at the hearing by telephone.  R. 62, 78-79.

Delonjay gave the first testimony.  She said she lived with her husband.  She and her husband had grown children who did not live with them.  She last worked on August 12, 2012.  Delonjay said that her

"memory was really lapsing."  In her last employment she interviewed

people for a drug study.  She said she re-interviewed the same person

because of her memory lapse.  She said she was not fired, "No, I quit more

or less because I knew that I wasn't up to doing the job correct.  It was an

important job."  R. 66.

Delonjay indicated that she broke her right humerus on January 27,

2008.  She said that six months later, she underwent right shoulder

replacement surgery.  R. 66.

Delonjay testified that she experienced daily migraine headaches.

She stated that the headaches lasted an average of four to six hours.  She

said she would lie down, shut off all noise and all light, and take her

medication Fioricet (Fiorinal in the transcript).  R. 68.

Delonjay indicated that she had a neck fusion surgery in 2007, a year

before she broke her humerus.  She said the pain affected her work as a

researcher.  She testified she was still able to do the job, but not her best.

She stated that her supervisors started writing her up.  R. 68-69.

Delonjay described her neck pain.  She testified the pain was "like

inflammation that just gets out of control."  She said she could not turn her

neck to the right or left because of the pain.  She stated that she could not

move her head up or down because of the surgery.  She indicated she had

nerve pain shooting down her arms.  R. 69.  The pain radiated into her fingers.  She said nothing alleviated the pain.  R. 69-70.

Delonjay testified that she had muscle pain in her legs daily.  She described the pain as "a deep throbbing pain."  Her pain medication, hydrocodone, allowed her to cope with the pain, but the pain did not go away.  She indicated hot baths helped with the pain.  She took hot baths three to four times a day.  She stayed in the tub for about 15 minutes each time.  R. 70-71.

Delonjay said that nothing else helped with the pain.  She testified, "Laying down doesn't help because it just makes you feel it worse.  I will get up and walk, pace the floor so that I feel that instead of laying down and feeling the pain."  R. 71.

Delonjay tried inpatient drug rehabilitation when she quit her job.  She testified,

> That was like when I quit my job I had to - - my husband  was not understanding the pain and he thought I was addicted to pain pills, and I needed to find out if I was or I need -- I was very confused so I did go to rehab in California.

R. 71.  She was in inpatient rehabilitation treatment for 47 days.  She said, "The result was that they had me on more medication when I came home than I was on when I went there."  T. 72.

Delonjay testified that she also had a concussion in an automobile accident many years ago. She had memory problems for three months after the auto accident. She indicated she later dove into three feet of water and hit her head again. She said the memory problems came back then. She testified she then fell down a flight of stairs and hit her head and broke her shoulder. She was unconscious after that fall. She stated that her memory has not gotten better since that fall. R. 72-73.

Delonjay testified that the MRI of her brain was normal. She said her doctor compared her to a football player who suffered concussions, "[T]hey're fine for a while and then suddenly they're having like sort of compared to dementia, and they relate that back to the trauma their head injuries had during the football." R. 73.

Delonjay said that during the day she changed positions and took hot baths to alleviate the pain. She said that no position alleviated the pain completely. R. 76.

Delonjay testified that she could lift a gallon of milk to pour a drink, but could not carry it around. She said she could not bend, stoop, or squat because her legs were too weak. She indicated that she did some light housework. She washed dishes about twice a week. R. 77. Delonjay said

that her husband helped her dress and bathe.  He shampooed her hair.  He helped her put on her clothes.  R. 78.

She stated she could concentrate for 20 to 30 minutes.  She said she had trouble driving because sitting in her car made her legs hurt worse.  Her husband usually drove her.  She stated that her husband did the shopping, but she accompanied him sometimes.  R. 78.

Dr. Minkus then testified.  The ALJ asked Minkus the following hypothetical question:

> Let's assume an individual closely approaching advanced age 50 but under 55, 12th grade education, and the past relevant work history is doing government surveys for both the Census Bureau and private companies that were contracting with the government . . .
> . . . .
> Okay. All right. Well, let's say 20 pounds occasionally, 10 pounds frequently; standing and walking a total of six hours in eight, sitting total of six hours in eight; the posturals, balancing, kneeling, crouching, crawling, stooping, ramps, and stairs would all be occasional; no ladders, ropes, or scaffolds.
>
> I'm going to say no overhead tasks, so there's no reaching overhead but handling, fingering, feeling, pushing, pulling, and reaching in directions -- other directions just not overhead, those can all be frequent; and then simple routine tasks.
>
> So starting with that, are there any occupations that such a person could do?

R. 80-81.  Dr. Minkus opined that such a person could work as a sub-assembler electrical equipment, with 32,000 such jobs nationally, and

1,000 in Illinois; a bench assembler with 70,000 such jobs nationally, and 2,600 in Illinois; a product assembler with 65,000 such jobs nationally, and 2,600 in Illinois.  R. 82.  Dr. Minkus opined that such a person could not perform any of these jobs if the person were limited to occasional reaching, handling, and fingering.  R. 83.

Dr. Minkus testified that a person could not work if she were consistently absent from work three days a month.  She also opined that a person could not work if she was off-task 20 percent or more of the time during the workday.  R. 85-86.  The hearing concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on November 3, 2015.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to the claimant's prior work considering age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his or her prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Delonjay met her burden at Steps 1 and 2. She had not engaged in substantial gainful activity since August 11, 2012, and she suffered from severe impairments of history of concussion, history of

right comminuted humerus fracture, degenerative disc disease of the cervical spine with history of fusion surgery, anxiety, and borderline personality disorder.  R. 35.

As part of Step 2 of the Analysis, the ALJ found that Delonjay's headaches were not severe.  The ALJ noted that Dr. Childress diagnosed daily migraine headaches in February 2014.  The ALJ did not find that evidence persuasive in light of other evidence in the record.  The ALJ cited: the record of her March 11, 2013 visit with Dr. Childress in which he said she had intermittent tension headaches rather than migraine headaches; the MRI of her brain that showed normal results; the January 13, 2014 office visit with Dr. Carpenter in which she reported that her headaches were better with montelukast (Singulair); the March 11, 2013, office visit with Dr. Childress in which she reported that the headaches were controlled with Fioricet; the January 28, 2015 office visit with physician's assistant Thobaben in which she was negative for headaches on examination; and the January 29, 2015, office visit with Dr. Scott Smith in which Delonjay reported that she had occasional headaches.  R. 36.

The ALJ also found at Step 2 that Delonjay's nausea and other abdominal problems were not severe. The ALJ cited the medical evidence

that her condition was addressed when she had cholecystectomy surgery.

R. 36.

At Step 3, the ALJ determined that none of Delonjay's impairments or combination of impairments met or medically equaled any Listing.  R. 38-40.

At Step 4, the ALJ found that Delonjay had the following RFC:

> After careful consideration of the entire record, the undersigned  finds  that  the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b).  She can lift 20 pounds occasionally and 10 pounds frequently.  She can stand and walk a total of 6 hours in 8 and sit a total of 6 hours in 8.  She can never climb ladders, ropes or scaffolds.  She can occasionally balance, kneel, crouch, crawl, stoop and climb ramps and stairs.  She cannot reach overhead, but she can frequently reach in other directions.  She can frequently handle, finger, feel, push and pull. The claimant can perform simple routine tasks.

R. 41.  The ALJ relied on the consultative examinations of Drs. Kozma and Froman; the opinions of Drs. Madala and Lanier; the numerous references in the record that Delonjay exercised five or more days per week; Dr. Harris' recommendation on June 20, 2013, to exercise more; the medical examinations in which she had normal strength and normal range of motion; the records from Dr. Arndt that she had no CVA pain and a little low back pain, and other medical records that showed no CVA pain; the MRI of her brain that was normal; and the lack of x-rays, scans, nerve conduction

studies, or other tests to confirm the severity of her condition.  R. 41-54.

The ALJ also relied on the fact that Delonjay engaged in substantial gainful activity after her 2007 and 2008 surgeries.  R. 51.

The ALJ gave only limited weight to Dr. Childress' opinions.   The ALJ stated that Dr. Childress' opinions were based on Delonjay's subjective complaints because "very little objective medical evidence" existed to support the opinions.  The ALJ found that "Dr. Childress also appears to be actively attempting to assist the claimant in her requests for help with her application for benefits, despite the lack of objective evidence in the file." R. 50.  The ALJ also relied on the fact that Delonjay had not been referred to a specialist for her neck, back, or shoulder since the alleged onset date. R. 51.

The ALJ found Dr. Childress' first two opinions on October 4, 2012, and February 10, 2014, that she was 100% incapacitated were "too general and vague to be given much weight."  R. 51. The ALJ also said the two were inconsistent with the third opinion on August 4, 2014, because Dr. Childress opined that she "could do work that lies between the light and sedentary exertional levels."  R. 51.  The ALJ accepted Dr. Childress' opinion in the Medical Source Statement that Delonjay could lift 20 pounds occasionally and 10 pounds frequently, but rejected the rest.  The ALJ

rejected the opinions primarily because of the lack of x-rays, imaging, or electro diagnostic studies to support the opinion; and a lack of observations from other doctors to support the opinions.  R. 51.

The ALJ considered Dr. Froman's GAF score of 55.  The ALJ erroneously said he considered "each of the GAF scores," but Dr. Froman is the only doctor who assigned a score.  Drs. Mehr and Lanier repeated Froman's score in their Psychiatric Review Techniques forms.  R. 94, 106.  The ALJ gave the GAF score limited weight because of its subjective limitations and because one score is of a person's condition at a given moment.  R. 52-53.

The ALJ also considered the statements of Delonjay's husband and sisters, but gave them little weight because the opinions were lay opinions that were not supported by the other evidence in the file.  The ALJ, however, noted that Jeffrey Delonjay's statements that Delonjay cleaned, cooked, did laundry, went shopping three to four times a week, visited grandchildren, drove, and watched television were inconsistent with Delonjay's claims about the severity of her symptoms.  R. 53.

After determining Delonjay's RFC, the ALJ found at Step 4 that a person with her RFC could not perform her prior work because none involved only simple routine tasks.  R. 54.

At Step 5, the ALJ found that Delonjay could perform a significant number of jobs in the national economy. The ALJ relied on the RFC determination; the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2; and the opinions of Dr. Minkus that such a person could perform the sub-assembler, electrical equipment job, the bench assembler, and production assembler job. R. 54-55. The ALJ concluded that Delonjay was not disabled.

Delonjay appealed. On November 4, 2016, the Appeals Council denied Delonjay's request for review. The decision of the ALJ then became the final decision of the Defendant Commissioner. R. 9. Delonjay then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence. The RFC determination was supported by the consultative examinations of Drs. Kozma and Froman; by the opinions of Drs. Smith, Madala, Mehr, and Lanier; and by the medical records that showed normal range of motion except for her right shoulder, no CVA pain, limited low back pain, occasional headaches controlled by medication, regular exercise five or more days per week; and normal results of an MRI of her brain.

The ALJ's decision not to credit Dr. Childress' opinion was supported by the conflicting evidence from Drs. Kozma, Arndt, Scott Smith, and

Harris; and the lack of x-rays, MRIs or other imaging, EMG/nerve conduction studies, or other medical tests or studies that would support his opinion.  The RFC determination and Dr. Minkus' opinions supported the ALJ's conclusion at Step 5 that Delonjay could perform a significant number of jobs in the national economy.  Substantial evidence supported the decision.

Delonjay argues that the ALJ's RFC determination was not fully grounded in the evidence.  The Court disagrees.  The decision was fully grounded in the examinations of Drs. Kozma and Froman; the records from Drs. Harris, Scott Smith, Arndt; some of the medical records from office visits with Dr. Childress; the opinions of Drs. Smith, Madala, Mehr, and Lanier; and the repeated medical notes that she exercised five or more days per week.

Delonjay argues that the ALJ made up the RFC first and then selected credited evidence that supported it.  The Court again disagrees.  A fair reading of the decision shows that the ALJ relied on the consultative examinations, the lack of consistency between Dr. Childress' examination records and the records of the other treating and examining physicians and health professionals, and the paucity of objective imaging or electro diagnostic testing evidence.  The ALJ discounted Dr. Childress' opinions

because his opinions were inconsistent with findings by other physicians during examinations and because significant objective test results did not exist in the record.

Delonjay cites <u>Murphy v. Colvin</u>, 759 F.3d 811 (7th Cir. 2014) to support her claim that the ALJ did not ground his RFC determination in the evidence. The ALJ in Murphy failed to build a logical bridge from the evidence to his conclusion. Id. at 819. The ALJ built such a bridge here. The findings of Dr. Kozma, combined with the treatment notes of Drs. Harris, Arndt, Scott Smith and physician's assistant Thobaben; and the opinions of Drs. Smith, Mehr, Madala, and Lanier supported the RFC determination. The <u>Murphy</u> case does not apply. The RFC determination was supported by substantial evidence.

Delonjay argues that the ALJ did not rely on Dr. Froman's opinion. The Court disagrees. Dr. Froman opined that Delonjay could "perform one or two step assemblies at a competitive rate." R. 305. The ALJ found that Delonjay had the RFC to perform "simple routine tasks." Delonjay argues that these two characterizations of Delonjay's function abilities are inconsistent. She cites the Department of Labor's Dictionary of Occupational Titles (DOT) to support this argument. The DOT categorizes different aspects of jobs. One aspect is reasoning ability. The simplest

level of reasoning ability in the DOT, R1, involves, in relevant part, the ability to "apply commonsense understanding to carry out simple one- or two-step instructions." The next higher level of reasoning, R2, involves the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions." DOT, Appendix C, § III General Education Development, 02 Reasoning Level Development and 01 Reasoning Level Development, available at

https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM,

viewed February 6, 2018. Delonjay argues that Dr. Froman's opinion limited Delonjay to jobs with an R1 reasoning level, but the ALJ's RFC determination improperly included jobs with R2 reasoning. The representative jobs cited by Dr. Minkus had a reasoning level of R2.

The Commissioner correctly points out that Dr. Froman did not opine that Delonjay was limited to jobs with simple one- or two-step instructions. He opined that she could perform simple one- or two-step assemblies. Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 15), at 9. The DOT reasoning categories (R1, R2, etc) describe the type of instructions a person must understand to perform a job, not the functional steps a person must follow to perform the job. The Commissioner also points out that the bench assembler job cited by Dr.

Minkus (a/k/a assembler, small products I), DOT No. 706.684-022, has a reasoning level of R2, but often involves assembling one or two specific parts. The ALJ's RFC finding of an ability to perform simple, routine tasks is consistent with Dr. Froman's opinions.

Delonjay argues that the ALJ erred in not crediting Dr. Childress' opinions. The Court disagrees. The ALJ must give the opinions of a treating physician controlling weight if the opinions are supported by objective evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527(d)(2); Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008).[4] The ALJ found that Dr. Childress' opinions were largely not supported by objective evidence in the file and were inconsistent with other medical evidence in the file. The ALJ found that the opinions were inconsistent with the findings of Dr. Kozma; and the treatment notes from Drs. Arndt, Scott Smith, Harris. The ALJ also found that Dr. Childress' opinions were not well supported by any x-rays, MRIs or other imaging, EMG/nerve conduction studies, or other objective medical tests or studies that would support his opinion.

---

[4] The Commissioner recently amended the regulations regarding the interpretations of medical evidence. The amendments apply prospectively to claims filed on or after March 27, 2017. Revisions to Rule Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017). As such, the amendments do not apply here.

Delonjay notes that the ALJ incorrectly stated that Dr. Childress'
August 4, 2015 opinions indicated that Delonjay could perform work at an
exertional level between light and sedentary work.  Delonjay is correct on
this point.  This statement does not appear in the August 4, 2017 medical
source statement of Dr. Childress.  The ALJ, however, did not just rely on
this observation in assessing Dr. Childress' opinions.  As discussed above,
the assessment of Dr. Childress' opinions was inconsistent with the
medical treatment and examination notes by Drs. Kozma, Harris, Arndt,
Scott Smith; and the opinions of Drs. Smith, Mehr, Madala, and Lanier.  Dr.
Childress' opinions were not supported by imaging, EMG/nerve conduction
studies, or other tests.  The ALJ's decision not to credit most of Dr.
Childress' opinions was supported by substantial evidence.

Delonjay argues that the ALJ erred in the consideration of her
headaches.  Delonjay argues that the ALJ failed to consider her headaches
in the formulation of the RFC.  As discussed above, the ALJ adequately
addressed her impairments, including her headaches in his opinion.  The
ALJ is not required to address each piece of evidence.  See Murphy, 759
F.3d at 817-18.  There was no error.

Delonjay also argues that the ALJ erroneously found that she had
both tension headaches and migraine headaches.  Delonjay is mistaken.

The ALJ only recited Dr. Childress' diagnoses.  Dr. Childress diagnosed tension headaches on March 11, 2013, and later diagnosed migraine headaches on February 10, 2014.  The ALJ did not err in characterizing these pieces of evidence.

Delonjay argues that the ALJ failed to consider her nausea adequately.  The ALJ treated the nausea appropriately.  The ALJ recited the evidence that indicated she had significant problems with nausea associated with problems with her gallbladder.  The ALJ then concluded that she was status post cholecystectomy.  R. 36.  The ALJ clearly found that the problem was no longer severe after the surgery.  Delonjay cites no evidence to the contrary.  The treatment of Delonjay's nausea was not error.

THEREFORE, IT IS ORDERED that the Defendant Commissioner's Motion for Summary Affirmance (d/e 14) is ALLOWED; Plaintiff Jody Delonjay's Motion for Summary Judgment (d/e 11) is DENIED; and the decision of the Commissioner is AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS CLOSED.

ENTER:  April 13, 2018

_____s/ Tom Schanzle-Haskins_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE